IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAY E. HAYDEN FOUNDATION; | ) | |
| CHARLES C. PALMER, Court Appointed | ) | |
| Administrator to Collect Estate of Martha L. | ) | |
| Hayden; and SARA JOHNSON, Court Appointed | ) | |
| Administrator for Estate of R. Maurine Johnson, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 08-CV-0325-MJR |
| | ) | |
| FIRST NEIGHBOR BANK, N.A.; CAROL JO | ) | |
| FRITTS; BRADLEY FITCH; JUNE HAYDEN; | ) | |
| WILLIAM A. SUNDERMAN; JOHN CUTRIGHT; | ) | |
| CUTRIGHT & CUTRIGHT, LTD.; RALPH GLENN; | ) | |
| GLENN & LOGUE; and MORRIS LANE HARVEY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

Plaintiffs, Jay E. Hayden Foundation, Charles C. Palmer and Sara Johnson, filed in this Court a two-count second amended complaint against Defendants, First Neighbor Bank, N.A., Carol Jo Fritts, Bradley Fitch, June Hayden, William A. Sunderman, John Cutright, Cutright & Cutright, Ltd., Ralph Glenn, Glenn & Logue and Morris Lane Harvey (Doc. 95). The second amended complaint alleges that Defendants entered into a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), **18 U.S.C. §§ 1962(c)-(d)**, by obtaining money from the Jay Hayden estate, Martha Hayden and R. Maurine Johnson through false and fraudulent pretenses and representations.

The Court has previously had cause to consider the issues herein. On December 17,

1

2008, the Court granted motions to dismiss filed by Defendants Sunderman, Harvey, Cutright and Cutright & Cutright, Ltd.; Glenn and Glenn & Logue; and First Neighbor Bank, N.A., Bradley Fitch, Carol Jo Fritts and June Hayden (Doc. 94). The Court determined that Plaintiffs' claims were barred by the applicable statute of limitations and dismissed the action without prejudice to Plaintiffs' filing an amended complaint. On January 5, 2009, Plaintiffs timely filed the second amended complaint, on which this action now proceeds.

Now before the Court are Defendants Cutright & Cutright, Ltd., and John Cutright's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 98); Defendants First Neighbor Bank, N.A., Bradley Fitch, Carol Jo Fritts and June Hayden's Motion to Dismiss Second Amended Complaint(Doc. 100); Defendant Morris Lane Harvey's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 102); Defendant William A. Sunderman's Motion to Dismiss the Second Amended Complaint (Doc. 104); and Defendants Glenn & Logue and Ralph Glenn's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 106). The motions have been fully briefed. The Court begins its analysis with a recitation of the key facts alleged by Plaintiffs.

## I. Factual background

The factual background set forth by Plaintiffs comprises a series of schemes: Martha and Jay Hayden scheme, M&M account scheme, IGA scheme, suspicions and attempted cover-up, and the stonewall. The Court adopts Plaintiffs' organization of their claims.

### A. The Martha and Jay Hayden scheme

Martha Hayden ("Martha') survived both her husband and her only child, Jay Hayden ("Jay"). She inherited various assets from her husband's estate and $400,000 from Jay, an investor in real estate, oil leases, horses and a grocery store. Robert Cochonour, a former state's attorney and

former Illinois 5th Circuit Court Judge, was appointed executor of Jay's estate in 1985 and served as such until 2002. Martha Hayden was diagnosed with Alzheimer's disease several years prior to October 2000 and died in 2001.

According to Plaintiffs, beginning in July 1985, Cochonour, in combination with Defendants, embarked upon an enterprise whereby he converted Martha's funds and Jay's estate to his own use by forging signatures, selling assets and transferring money among various accounts. Plaintiffs allege that Defendants assisted Cochonour in concealing his activities by such actions as preparing false legal and other documents, making misrepresentations in court and elsewhere, allowing him to forge signatures, approving and enabling fraudulent transactions, and obstruction.

**B. The M&M account scheme**

Plaintiffs contend that, between February 1993 and February 1996, Cochonour and the Bank Defendants (Fritts, Fitch, Hayden and First Neighbor Bank[1]) engaged in a continuous course of conduct to defraud R. Maurine Johnson ("Maurine") and Mary Cochonour Johnson ("Mary") of their property through the unlawful use of monies from Jay's estate and Martha's accounts. Specifically, Plaintiffs allege that Cochonour forged Maurine's and Mary's signatures, and intermingled funds from Maurine's account with funds from Jay's estate; he then used Plaintiffs' funds for his own benefit and that of his family. Plaintiffs maintain that the Bank Defendants approved and enabled these fraudulent transactions.

---

[1]First Neighbor Bank consists of several formerly independent banks which were known as Greenup National Bank, First National Bank in Toledo, First State Bank of Newman, First National Bank of Neoga and First National Bank of Charleston. At the relevant time, Fritts was the president and Fitch an officer of Toledo Bank; June Hayden was an officer of Greenup Bank. Plaintiffs' allegations regarding the M&M scheme specifically involve Toledo Bank and Greenup Bank.

### C. The IGA scheme

Plaintiffs allege that, in 2000, Martha's signature was forged on three loans, two of which were made to Hayden's IGA Partnership by Greenup Bank. By October, when the latter of these loans was made, Martha's doctor had concluded that she lacked the mental capacity to participate in any decision pertaining to business matters because of Alzheimer's disease.

Plaintiffs contend that Defendants Fritts, Fitch and Hayden knew that Martha's signature was forged but allowed the loan to be closed and the funds to be dispersed. They also contend that Defendant Sunderman, who represented Toledo Bank, learned of the forgery but did not take any action to report the matter to the bank, government officials or the Illinois Judicial Inquiry Board, of which he was chairman at that time. Plaintiffs submit that the forged promissory note and security agreement were used to assist Greenup Bank in obtaining insurance proceeds after a fire at the IGA.

Lastly, Plaintiffs allege that the third loan - made in December 2000 - was authorized by Fritts, Fitch, Hayden and Toledo Bank on Martha's forged signature. They assert that the loan was made despite the fact that Fritts knew that Martha was incapacitated and despite the fact that the IGA had burned while it purportedly owed approximately $89,000 to Toledo Bank.

### C. Suspicions and attempted cover-up

Plaintiffs submit that between January and June 2002, the schemes began to unravel. In January 2002, Cochonour partially acknowledged his theft of some of Maurine's funds used to open the M&M account. Cochonour allegedly persuaded Mary to drop the inquiry with a promise to repay $82,000.00, which he represented to be the total amount taken.

Plaintiffs allege that on February 13, 2002, the trustees of Jay's foundation filed

Request for Accounting and Explanation of Receipts. In March 2002, Fritts and Glen Warfel of First Neighbor Bank approached Hugh Eubank, a trustee of Jay's foundation, and requested that he and other trustees drop their inquiry. That same month, the trustees filed a complaint with the Illinois Judicial Inquiry Board. The trustees also notified the Illinois Attorney General of their concerns and, on April 24, 2002, the Attorney General filed a Petition to Intervene as of Right in the Jay Hayden Estate.

According to Plaintiffs, on February 19, 2002, Jay's cousin filed a letter with the court demanding a full accounting of the estate. In March 2002, matters in the court proceedings received press coverage. During that same month, Fritts filed a suspicious activity report with the Federal Bureau of Investigation indicating that Cochonour may have been mishandling accounts at First Neighbor Bank.

Plaintiffs submit that Cochonour retained Ralph Glenn of the Glenn & Logue law firm to represent him in the proceedings *In re: Estate of Jay E. Hayden*, No. 85-P-21. They allege that Glenn filed an objection to the Attorney General's motion to intervene as well as objecting to the removal of Cochonour as executor. Plaintiffs also allege that Glenn failed to disclose that he was involved in a case pending in front of Cochonour at the same time that he was representing him in *Hayden*.

The Attorney General was given leave to intervene on May 7, 2002. On that same day, Robert Cochonour resigned as a Circuit Court Judge but not as the executor of Jay's estate. On January 3, 2003, Cochonour entered a negotiated guilty plea to theft over $100,000 from Jay's estate during the period May 25, 1985 through November 30, 1990.

5

### E. The stonewall

Plaintiffs allege that Defendants have attempted to derail investigations into these transactions and that their obstruction continued well into 2007. They assert that Defendants have stonewalled on the production of documents and in depositions. Robert, Joe and Don Cochonour have refused to answer questions, asserting their Fifth Amendment privilege against self-incrimination. All three Cochonours have been held in contempt for refusing to answer questions and to produce documents.

Plaintiffs allege that they discovered in July 2004 that Fritts had made false or misleading statements in an April 2003 deposition regarding her knowledge of Cochonour's activities and regarding the relationship between Jay's estate and the M&M account.

In July or August 2003, Plaintiffs hired Attorney Mervin Wolfe to investigate the relationships among the Defendants in the belief that facts supporting a conspiracy could be uncovered. Plaintiffs contend that Defendants struck back by (1) causing all motions to be stricken or denied and almost all subpoenas quashed; (2) First Neighbor Bank's filing a motion for sanctions against Wolfe; (3) Sunderman's and Harvey's filing complaints against Wolfe with the Illinois ARDC; and (4) Harvey's advising Wolfe's wife in her divorce proceeding that he could have Robert Cochonour make favorable rulings and "do in" Wolfe.

Additionally, according to Plaintiffs, they learned in mid-2004 that Harvey and Sunderman had discussed that within six months Wolfe would be disbarred. Plaintiffs claim that during December 2003 and January 2004, the ARDC notified Wolfe that all investigations against him, numbered at more than 10, would be summarily closed but that he must leave the State and must tell the legal community that he was closing his Illinois practice. Plaintiffs state that, in December

6

2003, an individual called Wolfe's wife to inform her that he had been approached by someone close to the Cochonours who offered him money to murder Wolfe. Wolfe went into hiding for the next six months.

Plaintiffs maintain that, throughout 2004, efforts to obtain information were thwarted because individuals said that they did not remember, refused to answer or invoked attorney-client privilege. In a meeting with Mary and her attorney in 2004, Plaintiffs learned for the first time about wrongful transactions and activities that occurred as early as 1992. Investigations by the assistant state's attorney and judicial proceedings continued in 2004 and 2005. Plaintiffs allege that during a four-day deposition in July and August 2005, Cochonour gave exhaustive and detailed admissions of repeated forgeries and thefts involving the M&M account and Jay's estate. Plaintiffs continued to obtain information regarding the Hayden and Johnson assets - and the fraudulent activities related to them - through 2007.

## II. **Legal Standard**

Defendants' motions are brought under various Rules of the Federal Rules of Civil Procedure - 9(b) 12(b)(1), 12(b)(6), 12(b)(c) and 12(c). Because all Defendants assert a common defense - that Plaintiffs' claims are time-barred by the applicable statute of limitations - the Court will first analyze the motions under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

Because a complaint need not anticipate an affirmative defense, such as the statute of limitations, a dismissal for untimeliness at the pleading stage is unusual. ***Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 674 (7th Cir. 2009) ("*Cerberus*") (citation omitted)**. A Rule 12(b)(6) challenge to the sufficiency of the complaint is generally limited to the

7

four corners of the complaint. ***Thompson v. Illinois Department of Professional Regulation*, 300 F.3d 750, 753-54 (7th Cir. 2002) (citing *Jefferson v. Ambroz*, 90 F.3d 1291, 1296 (7th Cir. 1996) ("[I]f a plaintiff chooses to 'plead particulars, and they show he has no claim, then he is out of luck - he has pleaded himself out of court.' ") (quoting *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir.1994)); *R.J.R. Serv., Inc. v. Aetna Cas. and Sur. Co.*, 895 F.2d 279, 280 (7th Cir. 1989) (holding a court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or assign any weight to unsupported conclusions of law."))**. "[W]hen the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness," dismissal is appropriate. ***Cerberus,* 559 F.3d at 674-75**; *see also* ***Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718 (7th Cir. 1993) (stating that if a litigant "pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court") (collecting cases)**.

In assessing whether a complaint states a claim upon which relief can be granted (thereby escaping Rule 12(b)(6) dismissal), the district court accepts all well-pleaded allegations as true and draws all favorable inferences in plaintiff's favor. ***Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).** *See also* ***Erickson v. Pardus*, – U.S. –, 127 S.Ct. 2197, 2200 (2007).**

Specific facts are not necessary for a complaint to survive a motion to dismiss for failure to state a claim. ***Jervis v. Mitcheff*, 258 Fed.Appx. 3, 5 (7th Cir. 2007).** But labels and conclusions alone will not suffice. Rather, the complaint must contain enough facts to state a claim that is plausible on its face, and the complaint must give the defendants "fair notice" of the grounds on which plaintiff's claim rests. ***Killingsworth,* 507 F.3d at 618.** No longer does it suffice for a

8

complaint to avoid foreclosing possible bases for relief; the complaint must indicate that the plaintiff *has* a right to relief. *EEOC v. Concentra Health Services, Inc.*, **496 F.3d 773, 777 (7th Cir. 2007)**.

### III. Analysis

Congress enacted RICO, Title IX of the Organized Crime Control Act of 1970, in response to increasing concern regarding the expanding power of organized crime. **John E. Grenier and Sally S. Reilly, "Civil RICO – The Scope of Coverage After Sedima," 47 Ala. Law 260 (1986).** Although RICO originally was intended to attack the infiltration of legitimate businesses by organized crime, RICO's *civil* provisions have sparked the most controversy in application. *See, e.g.,* **Dan A. Narnjo and Edward L. Pina, "Civil RICO: Overview of the Eve of the 200th Anniversary of the Federal Judiciary," 21 St. Mary's L.J. 23, 24 (1989).**

It is those civil provisions which Plaintiffs allege Defendants violated. Section 1962 of RICO prohibits a person from engaging in four types of conduct:

(1) **§ 1962(a)**: Using or investing any money received from a pattern of racketeering activity to acquire an interest in, establish or operate an enterprise;

(2) **§ 1962(b)**: Acquiring or maintaining an interest in or control of an enterprise through a pattern of racketeering activity;

(3) **§ 1962(c)**: If employed or associated with an enterprise, conducting or participating in the conduct of the enterprise's affairs through a pattern of racketeering activity; and

(4) **§ 1962(d)**: Conspiracy to violate any of the above.

**Greiner, et al.,** *Civil RICO***, at 260.**

Section 1962(c) of RICO provides the right to pursue a private civil action to any person who suffers injury to his "business or property by reason of a violation of Section 1962." To

9

state a viable cause of action under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. ***Slaney v. The Int'l Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir.),** *cert. denied***, 122 S. Ct. 69 (2001) (citing** *Sedima, S.P.R.L. v. Imrex Co., Inc.***, 473 U.S. 479, 496 (1985).**

The limitations period for RICO suits is "four years from the date that [Plaintiffs] discovered (or should, if diligent, have discovered) that [they] had been injured by the defendants." ***Limestone Development Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 800 (7th Cir. 2008) (citations omitted)**. "[The] four-year period for RICO claims begins to run when the plaintiff[s] knew or should have known that [they were] injured, 'even if [they had] not yet discovered the pattern of racketeering.'" ***Reeves v. Frierdich,* 202 F.3d 274 (7th Cir. 2000) (quoting** *McCool v. Strata Oil Co.***, 972 F.2d 1452, 1464-65 (7th Cir. 1992)**).

This action was filed on May 5, 2008. As a result, if Plaintiffs discovered, or should, if diligent, have discovered, their injury prior to May 5, 2004, their RICO claims are time-barred. In support of their contention that they were unaware of their injury prior to the 2004 deadline, Plaintiffs allege a number of events that transpired within the limitations period, including, *inter alia,* the discoveries that (1) Martha's name had been forged to a $188,473 check; (2) Fritts had attempted to coerce trustee Eubanks into stopping the trustees' inquiry into the management of Jay's estate; (3) the criminal division of the Illinois Attorney General's office had initiated contact with Cochonour's attorney in 2002, offering to make a plea agreement; (4) Cochonour forged Martha's signature to a $50,000 check, with the knowledge of Fritts, Fitch and Hayden; (5) Fritts had made false or misleading statements to the charitable trust division of the Illinois Attorney General's office; and (6) Sunderman, Harvey, Glenn and Cutright had attempted to derail the Wolfe investigation. In sum,

10

Plaintiffs claim that Defendants' fraudulent concealment continued until at least 2007, and, as a result of the cover-up, Plaintiffs discovered their injury after May 2004.

Despite the litany of continuing discovery of alleged fraud and concealment over a period of years, it is abundantly clear that Plaintiffs' cause of action accrued prior to May 2004. As set forth above, the statute of limitations began to run when Plaintiffs discovered or should, if diligent, have discovered they had been injured by Defendants and not at some later date when all of the elements of the conspiracy were known, ***Rotella v. Wood,* 528 U.S. 549, 555, 558 (2000) (statute of limitations begins running even if the plaintiff is unaware of the pattern of racketeering activity)** or when the last predicate act was discovered, ***Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187-192 (1997) (holding that a civil RICO claim accrues when the plaintiff "should have discovered" his injuries, not upon the discovery of his injuries and the last predicate act of alleged racketeering)**.

Plaintiffs' attempt to escape the bar of the statute of limitations by claiming that Defendants concealed their actions and that Plaintiffs continued to obtain information as late as 2007 is unavailing. The Supreme Court, in *Rotella*, eliminated the "injury and pattern" discovery rule that had been followed by some circuits in RICO civil actions. **528 U.S. at 554**. The Court reasoned that such a rule was "at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." ***Id.* at 555 (citations omitted)**.

The discovery of the harm, by Plaintiffs' own account, occurred more then five years before this suit was filed. As Plaintiffs allege, the purported conspiracy to defraud them of their property and to conceal and disguise this unlawful activity from them, began to unravel between

11

January and June 2002. Each Plaintiff - Maureen (through her agent Mary), Jay's trustees and Charles Palmer - discovered they had been injured by Defendants in 2002 or 2003, as detailed below.

In January 2002, Cochonour partially acknowledged to Mary his theft of some of Maurine's funds used to open the M&M account. That Cochonour only "partially" acknowledged his theft is unhelpful to Plaintiffs because it is "[n]ot the extent, but the fact, of injury starts the period running." ***Limestone*, 520 F.3d at 805 (citations omitted)**. Also, Plaintiffs' attempt to wall off Mary, who was Maurine's agent under a power of attorney because of Maurine's inability to manage her financial affairs, cannot be sustained. As the underlying complaint makes clear, in 2002, Cochonour acknowledged his theft from Maurine and provided Mary with an agreement to repay $82,000. That Mary, who was charged with managing Maurine's accounts, dropped the inquiry into the theft because of Cochonour's anger does not alter the fact that she had knowledge of the injury to herself and to Maurine. The 2002 admission of theft started the statute of limitations clock running because Mary was aware that Cochonour had stolen money from Maurine, and she was aware of the means by which he accomplished the theft - the M&M account. She lacked diligence in pursuing an investigation of the matter.

Also, beyond question, in 2002, trustees of Jay's foundation had discovered that there had been fraudulent transactions and an attempted cover-up. In February 2002, the trustees were concerned enough about the management of the foundation to file Request for Accounting and Explanation of Receipts. Fritts allegedly approached trustee Eubank and asked that he and the other trustees drop their inquiry into Cochonour, explaining that all matters between Cochonour and the foundation could be fully explained. The trustees also filed a complaint with the Illinois Judicial

12

Inquiry Board. The trustees were aware that Letters Testamentary filed in the estate had estimated personal property at $750,000, real property at $360,000 and annual income at $120,000. Yet, they learned that the trust had been designated a charitable trust with "no assets." This prompted them to seek intervention by the Attorney General - Charitable Trust Division. The trustees and executors of Jay's foundation attended the proceedings at which Cochonour and his family appeared and repeatedly asserted their Fifth Amendment privilege against self-incrimination. Judgment was entered against Cochonour for over five million dollars. In sum, the trustees knew that the foundation was injured, by whom it was injured and where accounts had been held as well as having knowledge of a potential cover-up by Fritts and First Neighbor Bank. That they failed to follow up and that the instant action was not filed until approximately five years after these events reflect a lack of diligence on their part bordering on inexplicable. The statute of limitations began running when the trustees "should have discovered" the injury even though they may have been unaware of the pattern of racketeering activity, *Rotella,* **528 U.S. at 555, 558**, and even though there may have been subsequent acts of racketeering, *Klehr***, 521 U.S. at 187-92**.

During April 2002, in the proceeding *In re: Estate of Martha L. Hayden*, No. 02-P-02, Bobbie Goodman (Jay's cousin) and Lois Bambrick filed petitions and motions to remove Joe Cochonour as executor and to declare parts of Martha's will invalid. The trustees, Goodman, appointed executors/administrators and their counsel attended the proceedings. Plaintiff Charles Palmer, the court appointed administrator-to-collect Martha's estate, was advised in 2003 of Wolfe's insistence that a conspiracy existed between Cutright, Sunderman, Harvey, Glenn, Fritts and others at First Neighbor Bank. Palmer and Goodman agreed with attorneys Wolfe and Frederick Roth that insufficient admissible facts and documents had been recovered to file complaints. However, the

discovery, of injury - even if the knowledge of the Lawyer Defendants' and the Bank Defendants' purported racketeering conspiracy was not obtained until much later - is sufficient to start the limitations period running. As the Seventh Circuit Court of Appeals declared, "that's beside the point - it is the discovery of the injury, not the elements of a particular claim, that gets the clock ticking." *Cerberus,* **559 F.3d at 675 (citing** *Rotella,* **528 U.S. at 555)**.

Finally, even if the events that occurred subsequent to May 5, 2004 were considered to be predicate acts,"[a] 'plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period.'" *Limestone,* **520 F.3d at 802 (quoting** *Klehr v. A.O. Smith Corp.,* **521 U.S. 179, 190 (1997))**. Nor can Plaintiffs save their claim by arguing that the post-2004 acts are a continuation of the fraudulent concealment engaged in by Defendants prior to 2004. They cannot through the "continuing violation" doctrine "revive the time-barred predicate acts and thus obtain redress for the harm caused by them." *Id.* **at 801**. As the Seventh Circuit reasoned, "That does not make good sense, and is not the law." *Id.* **(citations omitted).** The statute of limitations began to run upon the discovery of the injury, certainly no later than 2003, and "is not tolled by subsequent injuries." *Id*.

As a result, the four-year period for RICO claims began to run no later than 2003 even if Plaintiffs had not yet discovered the full extent or the pattern of racketeering. Nothing that Plaintiffs have alleged in their second amended complaint alters that reality and rescues their claims.

    **B.**    <u>**Equitable estoppel**</u>

In a last-ditch effort to save their claims, Plaintiffs assert that, even if their suit were filed outside of the statute of limitations, the doctrine of equitable estoppel serves to toll the date of the accrual of this cause of action because Defendants actively concealed their actions and hindered

14

Plaintiffs' attempts to learn the facts.

"Equitable estoppel, sometimes known as fraudulent concealment, 'suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing....'" *Cerberus*, **559 F.3d at 676 (quoting** *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm.,* **377 F.3d 682, 689 (7th Cir. 2004) (citations omitted))**. "Classic examples include hiding evidence, destroying evidence, or promising not to plead the statute of limitations." *Id*. **(citing** *In re Copper Antitrust Litig.,* **436 F.3d 782, 790-91 (7th Cir. 2006))**. Plaintiffs claim that Defendants obstructed their diligent efforts to investigate illegal activities by such acts as withholding documents, making misrepresentations and false statements, and engaging in intimidation and bribery.

Plaintiffs' argument cannot succeed. Their complaint lays out a history of discovery by Maurine's agent, Mary Johnson, by the trustees for Jay's foundation and by Palmer that began well before May 5, 2004. Plaintiffs' claims that the discovery of their injury was obstructed by Defendants' cover-up and stonewalling are belied by their own conduct. In 2002, Mary and her attorney began an inquiry into Cochonour's admitted theft from Maurine, but Mary dropped the inquiry when faced with Cochonour's anger. Also in 2002, the trustees began an inquiry into Cochonour's handling of Jay's foundation, filed a complaint with the judicial inquiry board and sought intervention by the Attorney General. In 2003, Palmer was advised of the purported racketeering conspiracy involving Martha's estate that included the Lawyer Defendants and the Bank Defendants. The present action, filed at least five-to-six years after the discovery of injury, is simply too late.

In sum, the Court finds that Defendants' motions must be granted because Plaintiffs' claims are barred by the applicable statute of limitations and the accrual of the action is not tolled by equitable estoppel.

## IV. Conclusion

For all of the above reasons, the Court **GRANTS** Defendants John Cutright and Cutright & Cutright, Ltd.'s motion to dismiss (Doc. 98); Defendants First Neighbor Bank, N.A., Bradley Fitch, Carol Jo Fritts and June Hayden's motion to dismiss (Doc. 100); Defendant Morris Lane Harvey's motion to dismiss (Doc. 102); Defendant William A. Sunderman's motion to dismiss (Doc. 104); and Defendants Ralph Glenn and Glenn & Logue's motion to dismiss (Doc. 106). The Court **DISMISSES** this action with prejudice pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**. This case is closed.

**IT IS SO ORDERED.**

**DATED this 16th day of June, 2009.**

                                                              **s/Michael J. Reagan**
                                                              **MICHAEL J. REAGAN**
                                                              **United States District Judge**